UNITED STATES of America, Plaintiff-Appellant,

v.

TEXAS EDUCATION AGENCY, et al., (Port Arthur Independent School District), Defendants-Appellees.

No. 81–2257.

United States Court of Appeals, Fifth Circuit.

March 1, 1982.

James W. Clute, Gregg Meyers, Atty., Civil Rights Division, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Richard L. Arnett, Asst. Atty. Gen., Austin, Tex., for Texas Educ. Agency & Dr. J. W. Edgar.

Banker Phares, Port Arthur, Tex., for Port Arthur Ind. School Dist.

Before RUBIN, JOHNSON and GARWOOD, Circuit Judges.

PER CURIAM:

This Court has before it for consideration the Joint Motion for Entry of Stipulation filed by the parties herein, the United States of America and the Port Arthur Independent School District, in connection with which they advise that they "have agreed to resolve their litigation by entry of the stipulation attached" and request this Court "to vacate the district court's judgment and order here on appeal, and remand this action with directions to implement the stipulation entered by the parties." [1]

This litigation commenced with an action filed in the Tyler Division of the Eastern District of Texas by the United States on

---

1. Although "Texas Education Agency" appears in the style of this case, since a time prior to the filing herein of the United States' below-referenced January 1980 Motion for Supplemental Relief there is no indication of the Texas Education Agency having in any way appeared in the case or having been formally served with any of the papers herein; indeed, so far as the record now before us discloses, Texas Education Agency has not been involved in this case since the August 14, 1970 severance and transfer hereinafter mentioned.

August 7, 1970, pursuant to 42 U.S.C. § 2000c–6 and the Fourteenth Amendment to the United States Constitution, against the Texas Education Agency and several school districts and their superintendents, including the Port Arthur Independent School District [PAISD] and its Superintendent. On August 14, 1970, the action against the PAISD and its Superintendent was severed into a separate suit, and was transferred on change of venue to the Beaumont Division. Following hearing of the severed suit in the Beaumont Division, the district court on September 15, 1970 issued an order requiring the PAISD "to develop and maintain a unitary school system." This order further required the PAISD to "immediately implement" a student attendance desegregation plan, the details of which were specified in the order; to have the black and white teacher and staff ratio at each school "substantially the same" as for the district as a whole, and to follow certain other specifications regarding faculty and staff; and to conduct all future school construction, consolidation, and site selection "in a manner which will prevent the recurrence of the dual school system structure once this desegregation plan is implemented." The order specifies that "this plan shall be put into effect on September 21, 1970," and concludes by stating "this Court shall retain jurisdiction of this cause." No party appealed the order.

Apparently nothing further transpired in the case until January 28, 1980, when the United States filed therein its Motion for Supplemental Relief requesting that the district court order the PAISD "to develop and implement [a student] assignment plan which will fully desegregate the Port Arthur schools" and "to assign faculty to schools in compliance with the Court's September 15, 1970 order and the requirements of *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (CA 5 1970)." The motion alleged in essence that the PAISD was operating essentially as many one-race or virtually one-race schools as it had been prior to the September 15, 1970 order and that, as it was "a system with a history of segregation," it had "the burden

of showing that such assignments are non-discriminatory." It also alleged that "unless enjoined by this Court, [the PAISD] will continue to operate a large number of one-race and virtually one-race schools in violation of federal law and the constitutional rights of the students attending those schools" and that the PAISD since September 1970 "continued to assign faculty and staff to schools in a manner which deviates from the requirements of this Court's September 15, 1970 order and from the requirements of *Singleton* . . . ."

After various extensions of time, the PAISD filed its Response to Motion for Supplemental Relief and its Motion to Modify Judgment. The Response alleged "it is the position of the PAISD that there is no need for the Court to enter any order as requested by the USA inasmuch as the PAISD has, in a motion of even date, requested the voluntary modification of the Judgment rendered by this Court on September 15, 1970." In its Motion to Modify, PAISD alleged that since 1970 the district's white student population had substantially declined and that:

"In late 1979, the USA made its first demand that the present plan of desegregation be modified. . . .

"For the past ten years, the PAISD has believed itself to be unitary and sees no reason to change this opinion. . . .

"The Motion for Supplemental Relief filed by the USA has caused the district to subject itself to close scrutiny and has, in that respect, proved most productive. The district now realizes that the fact that it is unitary should not foreclose the possibility of implementing a new technique designed to provide quality integrated education."

The PAISD further alleged that following the Motion for Supplemental Relief it created a multiracial Citizens Advisory Committee (four blacks, four whites, two Hispanics, one Vietnamese) "to study the present plan of desegregation for the PAISD and determine whether it should be left intact or modified . . .," and that the report of this committee recommending cer-

tain modifications in the plan if the district were found not to be unitary, was approved by the PAISD Trustees except that the Trustees requested the plan modifications even if the district were found unitary. The PAISD accordingly requested the district court to modify its September 15, 1970 order to authorize a magnet school program, and that:

"The program should be allowed a minimum of five years to prove itself. During that period refinements and adjustments will be required. A yearly evaluation will be submitted to the Court. At the end of five years, the district will move to obtain a judicial declaration of unitary status."

The PAISD further requested that the September 15, 1970 order be modified as respects its majority to minority student transfer provisions to require that such transfers be given preference, as opposed to being subject to available space, and also as respects its faculty and staff assignment provisions so as to allow for each school a 10 percent deviation factor from the district-wide racial ratios and so as to exempt a specified school at which all such personnel were volunteers.

The district court held an evidentiary hearing on October 8, 9 and 10, 1980 at which the United States and the PAISD presented their respective proposed desegregation plans and a variety of other evidence relating, among other things, to the school system, its facilities and the racial composition of the student body, faculty and staff within the district and at its various schools.

On April 27, 1981 the district court entered an order dismissing the case with prejudice and removing it from the court's docket together with a memorandum opinion. 510 F.Supp. 994. In its opinion the court noted that it had retained jurisdiction of the cause in 1970 "to ensure that the [1970] plan was promptly and properly implemented," that the plan had as its goal a unitary school system and "was implemented on September 21, 1970." The court further found that the PAISD "has been and is

in full compliance with the 1970 Order insofar as it relates to student assignment." Although it noted there was evidence that racially identifiable schools continue to exist in the district and this could trigger a presumption that such condition was "due to some intentionally segregative act" by the PAISD, the court nevertheless found that the PAISD had carried its burden of showing that this was not the case by demonstrating that the existence of predominately one-race schools was caused by factors beyond its control, principally "white flight." With respect to faculty and staff, the court found that while the PAISD had "not maintained strict compliance" with the *Singleton* ratio, the 1970 order had only required that the ratio in each school be "substantially" the same as that district-wide and the PAISD had made a good faith effort to comply. The court ruled that its 1970 order would be interpreted to allow each school's faculty and staff racial mix to vary from that of the district as a whole by 10 percent for grades below six and 15 percent for grades six and above, with Lamar school, having a special program, being totally exempted. The court then proceeded to, in effect, approve the PAISD's proposed magnet school program and closing of two specified elementary schools. In conclusion, the district court found "the PAISD has been unitary since September 21, 1970" and that "since there was no proof that the school district committed any act with segregative intent, the Court is without jurisdiction to entertain the motion of the United States."

The United States appealed the April 1981 order and thereafter this Court granted the motion of the United States for an extension of time to file the required documents on appeal until November 1981 to afford the parties an opportunity to negotiate a settlement. In November 1981 the United States and the PAISD filed with this Court their joint motion for a prehearing conference, with supporting memorandum brief and stipulation, advising that "a settlement has been reached" and that "after receiving the district court's order the

parties reopened settlement negotiations ... [which] produced the attached stipulation, under the terms of which the parties are willing to resolve this litigation" and requesting a prehearing conference under F.R.A.P. 33. Such a conference was held by one of the judges of this panel in which attorneys for the United States and for the PAISD participated and advised that they individually and the Justice Department and the PAISD had approved and agreed to the settlement embodied in the stipulation attached to the motion for prehearing conference, that the PAISD was in fact in the process of implementing the settlement and intended to continue implementing it unless and until directed otherwise, and that they believed the district court was in error in concluding that it did not have jurisdiction. Order was entered upon completion of the prehearing conference directing the parties to file their stipulation and a motion requesting the relief they sought, together with a supporting brief and factual stipulation. Following additional extension of time these documents were duly filed and are now before the Court for ruling.

■ A copy of the stipulation is annexed hereto as Exhibit A. We have analyzed the stipulation and approve it. It is obviously the result not only of a commendable desire on the part of both parties to resolve their litigation in a manner consistent with vindication of the rights of racial minorities under the Constitution and laws of the United States as well as with the goals of quality education for all students and local control of schools, but also of hard-minded and diligent efforts for the accomplishment of these sometimes difficult ends. The Justice Department and the PAISD have been in a genuinely adversary posture, and the record before us reflects that the case was vigorously and ably contested by competent counsel on both sides before the district court; there is no hint that the settlement has been motivated by any improper considerations or at the expense of unrepresented persons, and it appears to have been arrived at after mature, deliberate and informed consideration on both sides. It has been approved by the Department of Justice and the PAISD.

■ Such a settlement is entitled to a presumption of validity, which ordinarily may be overcome only if its provisions are not within reasonable bounds or are illegal, unconstitutional or against public policy. *See United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir. 1980). We hold this settlement meets these tests, though we do not thereby "reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute," *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) [quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2nd Cir. 1974)], as we recognize that normally a settlement is "a process of compromise in which, 'in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation,' *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 ... rather than an attempt to precisely delineate legal rights." *United States v. City of Jackson*, 519 F.2d 1147, 1152 (5th Cir. 1975). Nor, in the circumstances of this case, is there any reason for us to substitute our "own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong v. Board of School Directors*, 616 F.2d 305, 315 (7th Cir. 1980). And, obviously, a case may be settled on appeal, and the trial court is not the only level at which settlement may take place.

The procedure followed here has been specifically sanctioned in *Lee v. Macon County Board of Education*, 468 F.2d 956 (5th Cir. 1972). Decisions of this Court have upheld settlements in Title VII cases brought by the United States against local governmental units. *United States v. City of Alexandria, supra; United States v. City of Jackson, supra*. While the instant suit is not under Title VII, we believe that many of the reasons favoring settlement of Title VII cases also apply in the context of a case such as this. *Armstrong v. Board of School Directors, supra*. And it is our opinion that the provisions of 42 U.S.C. § 2000c–6, under

which this action was commenced, requiring the Attorney General to notify the appropriate school board and give it a reasonable time to adjust the matter before instituting suit, indicate that Congress looked with favor on voluntary resolutions of these matters. *See also* 20 U.S.C. § 1758.

We find no jurisdictional impediment to the order of remand requested by the parties. The September 15, 1970 judgment expressly provided for the retention of jurisdiction, and did so without any hint of modification or limitation. We cannot accept the district court's April 1981 construction of its earlier judgment that its retention of jurisdiction was merely until September 21, 1970 when the plan was to be (and was) implemented. No express reservation would have been necessary for the court to retain jurisdiction for that six-day interval. Moreover, paragraph I of the decretal portion of the September 15, 1970 judgment provides, without material qualification, that the district is ordered "to develop *and maintain a unitary school system*" [emphasis added]. Certainly the plain inference here is that the school district continues to be subject to this provision of the order after its initial full implementation of the detailed plan which the order's subsequent paragraphs described and required to be implemented by September 21, 1970. Further, paragraph VII of the decretal portion of the September 15, 1970 judgment orders that all school construction, consolidation and site selection "shall be done in a manner which will *prevent* the recurrence of the dual school structure once this desegregation plan is implemented" [emphasis added]. This is an express projection of the order beyond the initial implementation of the specified plan. The court's retention of jurisdiction is contained in paragraph VIII of its September 15, 1970 judgment, comprises the final substantive provision of that document, and cannot be construed as limited to implementation of the specific student and school assignment provisions which the decree set forth and required to be put in effect by September 21.

We note that this is the construction which each of the parties put on the order, as both the United States and the PAISD, while still in a distinctly adversary posture as to each other, moved the district court to amend its 1970 judgment and plainly assumed that it had retained jurisdiction to do so. The PAISD's motion indeed requested the court to continue to retain jurisdiction for an additional five years. And the district court's April 1981 order in effect is an exercise of jurisdiction, as in substance it approves the PAISD's magnet school concept (which is necessarily somewhat at variance with the attendance provisions of the 1970 judgment), and the closing of two schools and authorizes complete exemption of one school from the faculty and staff racial ratio provision of the 1970 decree.

Accordingly, having retained jurisdiction in its 1970 judgment, the district court erred in holding that it was "without jurisdiction to entertain the motion of the United States." *Lee v. Macon County Board of Education*, 584 F.2d 78, 81–82 (5th Cir. 1978). Without speaking to the question of under what circumstances a district court may err in retaining, or failing to retain, jurisdiction, it is plain that in this type of case it had the power to, and did, retain jurisdiction. *Lee v. Macon County Board of Education, supra*, at 81–82. *See Green v. Ferrell*, 664 F.2d 1292, 1294 (5th Cir. 1982). Moreover, it cannot be disputed that the district court had personal jurisdiction of the parties and that United States district courts have subject matter jurisdiction over suits brought by the Attorney General to enforce the equal protection rights of public school children. 42 U.S.C. § 2000c–6; 20 U.S.C. § 1706; 28 U.S.C. § 1345. Neither the district court nor any of the parties have ever suggested that any of the procedural prerequisites to suit by the United States are unmet, and it does not appear that if any are here present they are such as cannot be waived, at least where, as here, there is substantial compliance. *See, e.g., United States v. South Park Independent School District*, 566 F.2d 1221, 1225–26 (5th Cir. 1978). That the

United States alleged and presented in good faith what was at the very least a colorable claim of entitlement to the relief it sought cannot be doubted. *See United States v. Texas Education Agency (South Park Independent School District)*, 647 F.2d 504 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982). In these circumstances, questions such as whether in fact and in law the school district was unitary and the purpose, intent or effect of the district's school policies and procedures, relate to the merits of the case and to the issue of whether the United States proved its entitlement to relief, rather than to the jurisdiction of the district court.[2] Having jurisdiction of the parties and subject matter, there is plainly jurisdiction for the district court on remand to enter amended decrees of the sort involved here incorporating the agreement which the parties have made settling the merits of the suit.

Accordingly, the Joint Motion for Entry of Stipulation is hereby granted, the stipulation of the parties is approved, the April 1981 order of the District Court for the Eastern District of Texas herein is vacated and this case is remanded to the district court. On remand, the district court is directed to enter such orders as may be necessary to effectuate the stipulation so as to permit the Port Arthur Independent School District, as provided therein, to (1) create magnet schools and magnet programs, (2) alter grade structures, (3) close and consolidate schools, (4) reassign students, (5) redraw attendance zones, (6) provide for majority to minority transfer, (7) integrate faculty assignment, (8) plan for additions to the integration plan in subsequent years, and (9) file reports with the court to account for their actions, with notice provided to the United States. The district court shall retain jurisdiction for all relevant purposes and specifically to oversee the implementation of the stipulation, shall receive the reports required by the stipulation and, when moved by the parties, enter such proper orders as necessary to resolve disagreements between and objections by the parties, and to generally properly assist implementation. All previous orders of the district court in this case not inconsistent herewith remain in full force and effect.

It is further ordered that, with respect to those portions of the decree that call for the PAISD to take certain action during the portion of the 1981–82 school year after January 1, 1982, the PAISD shall be allowed an enlargement of time, not extending beyond the end of the 1981–82 school year, to the extent, if any, that PAISD's performance of such matters has been materially delayed or hindered by the pendency of this case during the period from January 1, 1982 to the date of this order. Should any question arise as to any such extension or its duration, the PAISD shall have the burden of demonstrating its entitlement to same.

### APPENDIX A

### STIPULATION

The parties in the cause styled above stipulate to entry of an order in this action which provides:

#### I. *Student Assignment*

The Port Arthur Independent School District (hereinafter PAISD) shall operate its schools free of discrimination towards students or faculty because of race, color, religion, sex, or national origin.

#### A. *1981–1982*

PAISD shall take the following actions for the 1981–1982 school year:

(1) *Summit Magnet Program.* Establish and operate as an integration tool an elementary magnet program at Washington Elementary School (the Summit magnet), so that the program satisfies the guidelines set out in part VI(A) of this stipulation.

(2) *Middle schools.* Create middle schools in the District. After the creation of

---

**2.** *See, e.g., Montana-Dakota Util. Co. v. Northwestern P.S.C.*, 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912, 917–18 (1951); *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1945); *Green v. Ferrell, supra.*

middle schools the grade structures shall be: for elementary schools, K–5; for middle schools, 6–8; for high schools, 9–12. The Austin school will house both a middle and a high school on one campus.

(3) *Wheatley.* Reassign students in the Wheatley school zone. Sixth grade students within this zone and sixth grade students in each subsequent school year, will be assigned to Austin Middle School; students enrolled in grades seven through twelve in the 1981–1982 school year will be given a choice of attending either Austin Middle and High School, or continuing at the Edison Middle or Jefferson High School.

B. *1982–1983 Plan*

By February 26, 1982 PAISD will develop and file a plan to be implemented in the fall of 1982 to continue integration of the PAISD schools in the 1982–1983 school year. The plan shall include, at minimum, these steps:

(1) *School closings.* Closing Sims, Carver, and Wheatley elementary schools. Sims and Carver shall remain closed. Wheatley shall be used to house special programs.

(2) *Zone lines.* Redrawing student attendance zone lines for the DeQueen, Sam Houston, Tyrell, Travis, and Lee schools so as to promote integration to the fullest practicable extent while (a) alleviating overcrowding at DeQueen, and (b) absorbing Sims students into other schools.

The PAISD plan will include with the proposed redrawn zones projections of student enrollment expected at each school after the zone changes are made. The projections will be based on the most current student locator information available.

(3) *Reassign Wheatley students.* Wheatley students will be assigned to Dowling or Pease to be integrated into the schools to the fullest extent practicable.

(4) *Reassign Carver students.* Carver students will be reassigned consistent with part I(E) of this stipulation so as to eliminate a racially identifiable school.

(5) *Lincoln Magnet Program.* Lincoln High School will offer magnet programs that include, but are not limited to, (1) a Petrochemical Career Institute, (2) a Computer Science Program, and (3) an Engineering Science Program. Programs at Lincoln shall not duplicate vocational programs offered at the Stillwell Technical Center, which shall continue to operate as a high school vocational magnet school.

C. *1983–1984 Plan.*

By February 26, 1983, PAISD will develop and file a plan to be implemented in the fall of 1983 to continue integration of the PAISD schools in the 1983–1984 school year. In addition to integration techniques implemented since fall, 1981, the 1983–1984 plan shall include:

(1) *Franklin Magnet School.* Converting Franklin to an elementary magnet school consistent with the standards set forth in part VI(A) of this stipulation.

(2) *Wilson Magnet School.* Plans to convert Wilson by the 1985–1986 school year to a magnet middle school consistent with the standards set forth in part VI(A) of this stipulation. Included will be a schedule of tasks, the completion of which are necessary to convert Wilson to a magnet school; a timetable which lists when those tasks will be done; programs to be offered; and projections of student enrollment anticipated, by race.

D. *High School Consolidation.*

PAISD shall provide for the consolidation of high schools in two phases, to be implemented so as to result in fully integrated high school grades at the earliest feasible date.

(1) *Two school plan.* When the total high school enrollment, excluding stu-

dents in magnet programs, becomes approximately 2,800, the system shall, at the beginning of the following school year, operate only two high schools.

(2) *One school plan.* When the total high school enrollment, excluding magnet programs, becomes approximately 2,200, only one high school shall be operated.

(3) *Consolidation timing.* If the first phase of consolidation has not occurred by October 31, 1984, the United States and PAISD will have sixty days to confer on another plan for integration. If no agreement results, the parties may submit proposed solutions to the Court, which shall hear evidence and render a decision consistent with part VI(B) of this stipulation.

(4) *Notice for consolidation.* Should the high school enrollment decline as described in part I(D)(1) and I(D)(2) above, PAISD shall provide notice to the Court and the Civil Rights Division of the Department of Justice regarding which school(s) it intends to close and the school(s) to which students will be reassigned, as well as the projected student enrollment, by race, that it expects will result at the remaining school(s) from such reassignment. Notice will be given pursuant to part IV of this stipulation.

E. *Majority-to-Minority Transfer.*

A majority-to-minority transfer system shall be utilized by PAISD as a device to further integrate the schools.

(1) *Definition.* Under this transfer provision, any student who attends a school in which his or her race constitutes a majority shall be permitted to choose to transfer to any school offering the appropriate grades where his or her race constitutes a minority.

(2) *Transportation.* Transportation for such transfers shall be provided at PAISD's expense.

(3) *Publicity.* PAISD shall publicize both the availability of majority-to-minority transfers and the fact that transportation for such transfers shall be provided without expense to the student. PAISD will make every effort to encourage such transfers, especially among the student populations of those racially identifiable schools remaining in the system. Whenever students must change schools because of closings or reorganizations pursuant to this stipulation or the plans to which it refers, the Board will notify students of and encourage students to exercise their option to make such a transfer.

F. *Incentives.*

At any time PAISD may, in its discretion, consider and implement, after notice pursuant to part IV of this stipulation, other incentives to integration not inconsistent with this stipulation, to reduce transportation and encourage the creation of neighborhood schools that are integrated. Such incentives may include:

(1) *Student exemptions.* Guaranteeing that students will be exempt from mandatory reassignment, should they desire to be, if they live in or move into neighborhoods within school zones where their race constitutes a minority.

(2) *Magnet placement.* Guaranteed placement in a magnet school or program for those students whose families move into a neighborhood that contains a magnet school, or school with a magnet program, when their race constitutes a minority in that neighborhood.

(3) *Group exemptions.* Exempting from mandatory reassignment neighborhoods within school zones or entire school zones which approximate the racial diversity of the school system as a whole.

(4) *Other.* Other incentives PAISD wishes to devise to promote integrated neighborhoods as a means of creating integrated neighborhood schools.

## II.  *Faculty Assignment*

Parts III through VI of the Court's September 15, 1970, order, regarding faculty assignment, shall remain in effect.  The parties agree that compliance with the Court order shall be achieved for faculty and staff who work directly with students where such faculty and staff are maintained within ten percentage points of the district-wide percentages for elementary schools, and fifteen percentage points of the district-wide percentages for middle and high schools.

Reassigned faculty members may, at the Board's option, qualify for neighborhood integration incentives such as those listed in part I(F), above.

## III.  *New Construction*

PAISD shall provide notice, pursuant to part IV of this stipulation, for any new construction which is proposed.

## IV.  *Notice*

### A.  *Persons to receive notice.*

Notice shall be made to:

| For PAISD: | For the United States: |
|---|---|
| Banker Phares | Gregg Meyers |
| Phares, Phares & Bass | Civil Rights Division |
| 2933 Park Place Plaza | Department of Justice |
| Port Arthur, Texas  77640 | Washington, D.C.  20530 |

The parties may designate another person to receive notice by giving ten days' notice of the change.

### B.  *Time.*

The Board shall afford the United States at least sixty days' notice of actions to be taken pursuant to this stipulation, during which time the United States will evaluate the proposal and make any objections.

### C.  *Clarifications.*

PAISD shall, upon request and reasonable notice to counsel for PAISD, furnish counsel for the United States necessary information relevant to questions that arise from PAISD proposals.  A request for further information shall stay the sixty day period for objections until the information requested is received.

## V.  *Reporting and Monitoring*

### A.  *February 26, 1982 report.*

To inform the Court and the parties of the progress of integration planning and implementation, PAISD shall make the following reports by February 26, 1982:

(1) A list of the schools in operation and the grade structure of each.

(2) Student enrollment statistics, by race, for each school and each magnet program operating.

(3) A description of the Summit magnet program implemented for the 1981–1982 school year, with an explanation of any modifications made to the program originally planned.

(4) A list of the schools to which Wheatley students were reassigned or to which they transferred, indicating the school; its enrollment, by race, before the reassignment or transfer; the number of students reassigned or transferred, by race; and the resulting student enrollment at the schools, by race.

(5) A summary of the steps taken to that date to prepare the plan for the 1982–1983 school year referred to in part I(B), above; a statement of tasks which remain before the plan is completed; and a timetable which lists when each outstanding task will be performed.

### C.  *February 26, 1982 plan.*

By February 26, 1982, PAISD shall also file its plan for further integration for the 1982–1983 school year, to include those provisions set forth in part I(B), above.

### D.  *February 26, 1983 plan.*

By February 26, 1983, PAISD shall file its plan for further integration for the 1983–1984 school year, to include those provisions set forth in part I(C), above.

### E.  *October 31 annual report.*

PAISD shall, on October 31, 1982, and October 31 of each year thereafter, file a report containing the following information:

(1) A list of schools in operation, their grade structures, and whether they are traditional schools, magnet schools, or schools that house magnet programs.

(2) Student enrollment statistics, by race, for each school, magnet school, and magnet program being operated at the time of the report, and

(3) A copy of faculty reports routinely filed during the preceding reporting period with the Equal Employment Opportunity Commission.

F. *Information.*

PAISD shall make available to the United States on reasonable notice and in a manner consistent with the orderly operation of the school system, its files, records, or other sources of information which the United States, may request from time to time in addition to the above reports to evaluate the status or progress of desegregation in the PAISD schools.

VI. *Success of the Plan*

Between the 1981–1982 and 1985–1986 school years, PAISD will have numerous opportunities to achieve integrated schools by voluntary means, such as magnet schools, magnet programs, grade structure changes, school closings, school consolidation, attendance zone changes, majority-to-minority transfers, and other incentives as set forth in this stipulation, as well as any other options PAISD wishes to propose to assist integration. PAISD recognizes its obligation to utilize those means so that vestiges of the formerly dual system are eliminated to the fullest extent practicable, as required by law and by part I of the September 15, 1970, order, which remains in effect.

A. *Evaluating magnet schools as a tool for integration*

Evaluation of the success of magnet schools as a tool for integration shall occur two years after implementation and be measured against projected racial enrollments at said magnet schools. In making the evaluation, actual enrollment, by race, within plus or minus twenty percentage points of the district's racial composition will be used as a benchmark of success. If a magnet school does not prove successful as described herein, the United States and PAISD will have sixty days to confer on another plan for desegregation. If no agreement results, the parties may submit proposed solutions to the Court, which shall hear evidence and render a decision consistent with part VI(B) of this stipulation.

B. *Modifications.*

If by the end of the 1984–1985 school year vestiges of the formerly dual system remain, the parties shall have sixty days within which to agree to an alternative plan to place PAISD students within integrated schools. If agreement on an alternative plan cannot be reached, each party may petition the Court to resolve the dispute after the presentation of evidence and proposals by each party, and the Court shall continue to retain jurisdiction of the case until those disputes are fully resolved.

C. *Subsequent violations.*

The United States may initiate any action it deems necessary and appropriate to remedy actions taken by PAISD subsequent to this decree which constitute independent constitutional or statutory violations.

VII. *Jurisdiction*

The parties agree to entry of a remand order from this Court which would provide as follows:

The April 28, 1981, order of the District Court for the Eastern District of Texas will be vacated and this case remanded. On remand, the district court is directed to enter such orders as may be necessary to effectuate this stipulation so as to permit the Port Arthur Independent School District, as provided herein, to (1) create magnet schools and magnet programs, (2) alter grade structures, (3) close and consolidate schools, (4) reassign students, (5) redraw attendance zones, (6) provide for majority-to-minority transfer, (7) integrate faculty assignment, (8) plan for additions to the

integration plan in subsequent years, and (9) file reports with the Court to account for their actions, with notice provided to the United States. The District Court shall retain jurisdiction for all purposes and specifically to oversee the implementation of this stipulation, shall receive the reports required by the stipulation and, when moved by the parties, enter such orders as necessary to resolve disagreements between and objections by the parties, and to generally assist implementation. All previous orders of the District Court not inconsistent herewith remain in full force and effect.

## VIII. *Entry*

It is hereby agreed that this stipulation be entered.

For the United States:

/s/ Wm. Bradford Reynolds

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division
Department of Justice
Washington, D.C. 20530

/s/ Thomas M. Keeling

Thomas M. Keeling
Attorney
Civil Rights Division

/s/ Gregg Meyers

Gregg Meyers
Attorney
Civil Rights Division

For the PAISD:

/s/ Clyde Gott

Dr. Clyde Gott
Superintendent
Port Arthur Independent
    School District
Port Arthur, Texas

/s/ A. Z. McElroy

President
Port Arthur ISD Board of
    Education

/s/ Banker Phares

Banker Phares
Attorney
Phares, Phares & Bass
2933 Park Place Plaza
Port Arthur, Texas 77640