628 F.Supp. 304 (1985)
UNITED STATES of America, Plaintiff,
Lulac, Gi Forum, and NAACP, Plaintiffs-Intervenors,
Leslie Dugas, Jr., Clevin Giles, Elaine Hudson, Dietrick Mays, Ernestine Randall, William Traylor, and Kimberly Wilson, Nelda Elizalde, Marianela Gonzalez, Aurora Gutierrez, Genoveva Marmodejo, Oralia Martinez, Irene Rael and Linda Reyes, Applicants for Intervention,
v.
STATE OF TEXAS, et al., Defendants.
Civ. A. No. 5281.
United States District Court, E.D. Texas, Tyler Division.
August 27, 1985.
*305 Kevin O'Hanlon and Robert Sinderman, Asst. Attys. Gen., State of Tex., Austin, Tex., Howard P. Willens and Bruce M. Berman, Wilmer, Cutler & Pickering, Washington, D.C., for defendants.
Stanford Von Mayrhauser and Joan Allen, Princeton, N.J., for Educational Testing Service.
Jeremiah Glassman and Joseph Rich, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for U.S.
Roger Rice and Camilo Perez-Bustillo, META Project, Cambridge, Mass., Albert Kauffman, Norma V. Cantu and Jose Roberto Juarez, Jr., Mexican-American Legal Defense and Educational Fund, San Antonio, Tex., Audrey Little, Asst. Gen. Counsel, NAACP-Special Contribution Fund, Brooklyn, N.Y., Richard Dockery, NAACP, Dallas, Tex., Larry R. Daves, Tyler, Tex., for plaintiff intervenors Lulac, G.I. Forum and NAACP.
JUSTICE, Chief Judge.
Plaintiff-intervenors[1] and the applicants for intervention ("applicants")[2] seek a preliminary injunction to restrain the State of Texas, acting by and through the Texas Education Agency ("TEA"), from excluding students who fail the Pre-Professional Skills Test ("PPST") from enrollment in teacher education courses at colleges and universities in Texas.
In 1981, the Texas Legislature enacted a statute requiring "satisfactory performance on a competency examination on basic skills prescribed by [Texas State Board of Education] as a condition to admission into an approved teacher education program."[3] The examination chosen by the State Board of Education was the PPST, which tests skills in mathematics, reading, and writing.[4] If a student falls below the preclusionary scores set by the Board on any of the three components of the test, a student *306 may not take more than six hours of courses in education until such time as he or she has passed all sections of the test. The test is apparently given about three times a year. A recent action by the State Board of Education allows students to take the PPST as often as it is administered, rather than only three times as the rules initially provided.
There is no dispute that the requirements relating to the PPST have prevented several thousand students from enrolling in teacher education courses. Nor is it disputed that its requirements have had a massively adverse impact on Black and Hispanic education students. As of July 1985, after more than 18,000 persons had taken the test, defendant's statistics showed that 73% of Whites who took the test one or more times passed; by contrast, Hispanics passed at a rate of 34% and Blacks passed at a rate of 23%.
Plaintiff-intervenors and applicants claim that the manner in which the test was adopted, and the severity of its sanctions, violate their rights to equal protection and due process under the Constitution, their rights under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, and their rights as third-party beneficiaries to the contract between the United States and the State of Texas guaranteeing equal educational opportunity in institutions of higher education in Texas. They also allege that the actions of the Texas Education Agency[5] with regard to the PPST violate this court's orders in United States v. Texas, 321 F.Supp. 1043 (E.D.Tex.1970), aff'd, 447 F.2d 441 (5th Cir.1971), cert. denied, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10 (1972). Since jurisdiction was retained in United States v. Texas, plaintiff-intervenors and applicants have come to this court for relief. A hearing was held on the motion for preliminary injunction between August 5 and August 14, 1985. Plaintiff-intervenors and applicants were represented at the hearing, as were the United States[6] and the State of Texas. Counsel associated with the Educational Testing Service ("ETS"), which developed the PPST, were present as special counsel for the State of Texas.
A threshold question to be resolved is whether plaintiff-intervenors' and applicants' allegations properly fit within the provisions of this court's orders in United States v. Texas. The defendant contended vigorously at the hearing that these allegations, while undoubtedly stating a claim, did not fall under this court's jurisdiction in United States v. Texas, and that the entire action should have been filed as a new suit, preferably in the Western District of Texas.[7] Therefore, the jurisdictional issue will be discussed first. Since it involves solely the characterization of plaintiff-intervenors' and applicants' claims, it must be clearly differentiated from the issue of whether they are entitled to a preliminary injunction, which involves an assessment of the merits of their claims.

JURISDICTION

A. Background

United States v. Texas was one of numerous actions involving desegregation of elementary and high schools in Texas. The action was filed on March 6, 1970. In late 1970, this court found that "the policies and practices of TEA have frequently whether inadvertently or by designencouraged or resulted in the continuation of vestiges of racially segregated public education within the state." United States v. Texas, 321 F.Supp. 1043, 1057 (E.D. Tex.1970), aff'd, 447 F.2d 441 (5th Cir. 1971), cert. denied, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10 (1972). The TEA was, therefore, ordered to devise a plan to remedy the segregation still extant in Texas. *307 The plan was submitted, and further hearings were held. On April 20, 1971, an order[8] was issued encompassing student assignments and transfers and, as well, changes in school district boundaries. Moreover, orders were included regarding desegregation in the six areas outlined by the Supreme Court in Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968): students, faculty, staff, transportation, extracurricular activities, and facilities.[9] This court retained jurisdiction of the action "for all purposes, and especially for the purpose of entering any and all further orders which may become necessary to enforce or modify this decree." United States v. Texas, 447 F.2d 441, 449 (5th Cir.1971).
Since the initial orders in 1971, this court has exercised its jurisdiction on several occasions to settle issues arising from the desegregation orders, including, inter alia, United States v. Texas, 342 F.Supp. 24 (E.D.Tex.1971) (finding Mexican-Americans a cognizable minority group and ordering desegregation of San Felipe Del Rio School District), aff'd, 446 F.2d 518 (5th Cir.1972); United States v. Texas, 356 F.Supp. 469 (E.D.Tex.1972) (enjoining state court proceedings restraining Highland Park School District from carrying out federal court order); United States v. Texas, 506 F.Supp. 405 (E.D.Tex.1981), rev'd on other grounds, 680 F.2d 356 (5th Cir.1982) (ordering bilingual education from 1-12 grades).[10]

B. Position of the Plaintiff-Intervenors

Plaintiff-intervenors and applicants claim that the manner in which the PPST was adopted, and the severity of the sanction for not passing each of its three components, violates Section E of the April 20, 1971, order, relating to treatment of faculty. Section E(1) of the order provides that:
Defendants shall not permit, make arrangement for, acquiesce in or give support of any kind to the hiring, assigning, promoting, paying, demoting, reassigning or dismissing, or treatment of faculty and staff members who work directly with children in a discriminatory manner on account of race, color, or national origin. Defendants shall be responsible for the application and enforcement throughout the State of the provisions of the Order of the Court in this case dated April 19, 1971 ... and specifically, the portions of that Order relating to the treatment of faculty and staff.
United States v. Texas, 447 F.2d at 446.
Section (E)2 of the April 20, 1971, order, to which plaintiff-intervenors and applicants also made reference during the *308 course of the hearing and in their briefs, provides as follows:
In carrying out its affirmative duties under Title VI and the Fourteenth Amendment in this area, the Texas Education Agency shall require each county or local educational agency desiring to receive state funds under the Minimum Foundation Program to include with its preliminary application for such funds a list of objective, non-racial, and non-ethnic criteria by which the county or district will measure its faculty and staff for assignment, promotion, demotion, reassignment, or dismissal and by which it will judge prospective employees for faculty and staff positions.
Id.
The plaintiff-intervenors' and applicants' principal allegations with regard to the manner in which the PPST was adopted include a lack of notice to students, colleges, and universities about the PPST until virtually the eve of the first administration, thereby preventing any preparatory programs; a failure on the part of the state to institute an organized program of remediationor, indeed, to take any action at allin the face of clear knowledge of the test's impact on minority students; and a failure to conduct an appropriate validation study, contracting instead for an allegedly superficial study which plaintiff-intervenors strongly imply was conducted expressly as a bulwark against litigation. The plaintiff-intervenors and applicants allege that the preclusionary scores on the PPST were adopted arbitrarily, with severe consequences for those who perform poorly. In addition, they contend that the exclusion of minority students from education programs without regard to other factors, such as grades or bilingual fluency, dams the flow of minority teachers at a time when the state faces severe shortages of teachers in general and bilingual teachers in particular. This result, plaintiff-intervenors and applicants charge, was both anticipated and intended by the TEA.
Plaintiff-intervenors and applicants assert that these actions violated the rights of both teachers and students under the United States v. Texas order. Plaintiff-intervenors and applicants also charge that TEA violated the rights of the teachers under Section E of the April 20, 1971, order, quoted above, "by their implementation of Section 13.032(e) in a discriminatory manner inconsistent with their obligation to use only valid, objective, non-racial and non-ethnic criteria for the hiring of faculty in the Texas public schools." They allege that the manner in which the PPST was adopted constituted "mak[ing] arrangement for ... the hiring ... of faculty and staff members who work directly with children in a discriminatory manner on account of race, color, or national origin." Further, they argue that TEA, by reason of its actions that would severely limit the pool of available minority teachers, was not only "permitting" and "acquiescing" in the hiring of very few minority teachers, but was thereby ensuring that the districts would have no choice but to pick from a virtually all-white pool.
Plaintiff-intervenors also maintain that students either have a right to role-models of their own race, or to an ethnically diverse group of teachers, or both. These contentions will be discussed in more detail below.
It is further alleged by plaintiff-intervenors and applicants that it is particularly appropriate for the court to assert its jurisdiction, because the PPST is the result of centralized decision-making at the state level, which gives school districts no flexibility in its implementation. Finally, it is insisted by plaintiff-intervenors and applicants that this is not an issue where the controversy revolves around individualized need and decision-making at the local level. See, e.g., United States v. Texas, 680 F.2d 356, 372-74 (5th Cir.1982) (cautioning the trial court, in dictum, about the wisdom of adjudicating such cases). Plaintiff-intervenors and applicants thus urge the court to protect its prior orders in United States v. Texas.

*309 C. Position of the Defendants

Defendants claim that since no issue relating to teacher competency testing arose before this court initially or was referred to by it in its subsequent opinions and orders, this court has no basis for jurisdiction over this issue. Defendants' Response in Opposition to Plaintiff-Intervenors' Motion for a Preliminary Injunction (hereinafter cited as Defendants' Response).[11] The defendants' position is, essentially, that the court must adhere to the literal wording of the initial order of April 20, 1971, contending that "[t]he plain language of the Order in no way implies any obligation for the Texas Education Agency as to its own future competency testing of college sophomores as a prerequisite to study in teacher training programs in colleges and universities." Id. at 9. In addition, the defendants maintain that the individuals seeking to intervene are not covered by the order in United States v. Texas, since the order deals with school students and faculty, and, because these education majors are no longer students and not yet teachers, they "fall in a gap" not covered by the order. Moreover, defendants argue that this court specifically stated in its order that no new burden of enforcement would be placed upon the state beyond its already existing burden of enforcing the Constitution and statutes of the United States, and "thus ... no enforcement action can lie against the State except for its obligations laid out in the Order." Id. Finally, defendants claim, contrary to the position taken by plaintiff-intervenors and applicants, that this controversy is a localized matter, and that each local institution is best attuned to the remediation needs of its students.

D. The Position of the United States

The United States, which took no stand concerning the merits of plaintiff-intervenors' and applicants' demand for a preliminary injunction, did agree with defendants that this court should not take jurisdiction of the complaint, although for different reasons than those advanced by the defendants. The United States took the position that the section related to faculty in the April 20, 1971, order was merely an incorporation of the requirements of Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1970) (Singleton III). It is certainly correct that, in many respects, the faculty section of the United States v. Texas order corresponds to the provisions of Singleton. Unquestionably, the Singleton case is best known for its precepts governing treatment of black faculty and staff in relation to demotions and dismissals during consolidation of school districts; nevertheless, Singleton also commands that there be no discrimination in the hiring of faculty. 419 F.2d at 1218. In addition, the United States v. Texas order included sections regarding faculty not derived from Singleton, notably Section E(2), which concerns the "objective, non-racial and non-ethnic criteria" by which prospective faculty and staff are to be judged in hiring decisions.
The United States acknowledged that the April 20, 1971, order encompassed discrimination in hiring, but argued that nothing in the case now presented to the court necessarily led to discrimination in hiring. Rather, the United States contended that the issue presently raised is solely related to discrimination in admissions to teacher education programs.

E. Applicable Law

It is settled law that "a court has jurisdiction to determine its own jurisdiction, subject to appellate review." Familia de Boom v. Arosa Mercantil, S.A., 629 F.2d 1134 (5th Cir.1980), cert. denied, 451 U.S. 1008, 101 S.Ct. 2345, 68 L.Ed.2d 861 (1981). It is equally "well settled ... that a district *310 court possesses ancillary jurisdiction to `secure or preserve the fruits and advantages of a judgment or decree rendered.'" Southmark Properties v. Charles House Corp., 742 F.2d 862, 868 (5th Cir.1984). What is less clear, however, is the standard to be employed in determining whether a particular issue is encompassed within an injunctive decree.
The proper standard, as set out in suits involving school desegregation, as well as other issues, appears to be whether the action complained of would thwart the purpose of the court's order. For example, in United States v. Perry County Board of Education, 567 F.2d 277 (5th Cir.1978), a petition to intervene over the proposed location of a new school was denied, since "the location of these schools would not thwart the goal of a unitary school system." Id. at 279. Intervention in another school desegregation case by concerned parents "to question current deficiencies in the implementation of desegregation orders" was considered proper. Hines v. Rapides Parish School Board, 479 F.2d 762, 765 (5th Cir.1973). See also Warren G. Cleban Engineering Corp. v. Caldwell, 490 F.2d 800, 803 (5th Cir.1974) (court in school integration case improperly exercised jurisdiction over contract dispute between builders of new school when "appellants have no connection with the desegregation of Pontotoc County Schools"). In Southmark Properties v. Charles House Corp., 742 F.2d at 869, the Court of Appeals for the Fifth Circuit noted that that failure to exercise jurisdiction by the district court would have "effectively nullified" the results of its order.
Obviously, the April 20, 1971, order did not deal specifically with the adoption of the PPST, and the circumstances presently before the court could not have been foreseen at the time of the initial order. Equally clearly, however, the purpose of the order was to enforce "defendant's [TEA's] affirmative duty to take `whatever steps might be necessary to * * * [eliminate] racial discrimination root and branch." United States v. State of Texas, 447 F.2d 441, 443 (5th Cir.1971), quoting Green v. County School Board, 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1693-94, 20 L.Ed.2d 716 (1968). It was noted that:
In this regard the duty of the State appears to be two-fold: First, to act at once to eliminate by positive means all vestiges of the dual school structure throughout the state; and second, to compensate for the abiding scars of past discrimination.
United States v. Texas, 447 F.2d at 443 (emphasis in original).
The duty of the state to "eliminate the vestiges of the dual school structure" necessarily entails the duty to create a unitary school system. United States v. Jefferson County Board of Education, 372 F.2d 836, 847 (5th Cir.1966), cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). This in turn includes, inter alia, the duty to offer all students an integrated faculty. "Segregation of faculty [is] among the most important indicia of a segregated system." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971). In fulfilling its duty to bring about a unitary, integrated school system, "it is not enough for school authorities to offer Negro children the opportunity to attend formerly all-white schools. The necessity of overcoming the effects of the dual school system in this circuit requires the integration of faculties ... as well as students." United States v. Jefferson County Board of Education, 380 F.2d 385, 389 (5th Cir.1967).[12] A unitary system thus envisions that minority children can neither be taught by all-minority faculty, as was the case before integration, nor by all-white faculty; and that this is part of the students' right to be educated in a unitary *311 school system. While students do not have a right to any particular racial mix of faculty, see Stafford v. Fort Bend Independent School District, 651 F.2d 1133, 1139 (5th Cir.1981), they do have a right to minority role models. As Judge Garwood noted in a recent case:
[I]t is well settled that plaintiffs, as black students and parents, had standing to urge their complaint that their Fourteenth Amendment rights were violated because minority students were denied role models by DISD's failure to promote black teachers to elementary or junior high school principalships or vice-principalships.
Price v. Denison Independent School District, 694 F.2d 334, 375 (5th Cir.1982) (emphasis added) (noting that the failure to promote must have been racially discriminatory).
Ample evidence was introduced at the hearing that the number of minority teachers available to teach in Texas schools would be greatly diminished as a result of the PPST requirement. Of almost 900 Blacks who have taken the PPST since it has been administered, only 203 passed. Of 2,136 Hispanics who have taken the test since it has been administered, merely 732 have passed. Thus, out of a potential pool of 3,031 minority teachers, less than a thousand have been able to continue with their education. The defendants' witnesses acknowledged at the hearing that minority students often return to teach in their own communities. It appears to be particularly true that those school districts with heavy minority populations, particularly those in the Rio Grande Valley, will be hardest hit by the exclusion of minority students from education programs. Those districts also, of course, have a greater need for bilingual teachers. Fifteen years ago, in United States v. Texas, it was noted that "actions of the State ... such as ... accreditation ... have augmented the inequalities between the small, all-black districts and their neighbors. Such action was ruled unconstitutional by the Supreme Court in Cooper v. Aaron...." 321 Supp. at 1051. Plaintiff-intervenors' Exhibit 10. A non-discretionary state-wide policy, deliberately adopted by the TEA with the knowledge that it would drastically reduce the statewide supply of minority teachers to the school districts and particularly to school districts with heavy minority populations, would fall under the jurisdiction of this court. This is especially true if, as plaintiff-intervenors and applicants allege, the policies were carried out intentionally. These actions would violate the order by impairing rights of students to equal education in a unitary school system, by disproportionately allocating the burden of the teacher shortage on school districts with a heavy minority population, and also by depriving students of a truly integrated group of teachers.
The Court of Appeals for the Fifth Circuit has repeatedly emphasized "the necessity for the district courts to retain jurisdiction over such cases [school desegregation] in order to ensure the ... achievement of the ultimate goala unitary school system." United States v. Texas Education Agency, 647 F.2d 504, 508 (5th Cir.1981) (overruling the district court's finding that it no longer had jurisdiction). See also United States v. Texas Education Agency, 679 F.2d 1104, 1109 (5th Cir.1982) (overruling district court's finding that it had no jurisdiction in school desegregation case, emphasizing need to "prevent the reoccurrence of the dual school structure"). Accordingly, this court must exercise jurisdiction over an issue which plaintiff-intervenors and applicants claim threatens to block the goal of a unitary school system throughout the State of Texas.
The PPST issue also clearly falls within the confines of this court's April 20, 1971, order prohibiting "non-racial, non-ethnic" criteria to be used in hiring. 447 F.2d at 446. The issue of whether or not standardized tests are inherently racist because of cultural bias, and whether or not they are adopted as a means of excluding minorities from the teaching profession, has been widely publicized. See, e.g., White, Culturally Biased Testing and Predictive Invalidity: Putting Them on the Record, 14 *312 Harv.C.R.-C.L.L.Rev. 89 (1979). In addition, this court's orders since the April 20, 1971, order have emphasized the need to recruit minority teachers. For example, after finding that the San Felipe del Rio School District had a segregated school system with respect to its Hispanic children, it was ordered that the district undertake "immediate initiation of systematic and intensive efforts to recruit minority group staff at professional, paraprofessional, and non-professional levels." United States v. Texas, 342 F.Supp. 24, 34 (E.D. Tex.1971), aff'd, 466 F.2d 518 (5th Cir. 1972). The order required "vigorous recruitment and staff development effort toward a long-range goal that the ethnic composition of the administrative staff approximate the ethnic composition of the district community." Id. at 30.[13] Finally, it noted the importance of employing "personnel reflecting the various ethnic and cultural backgrounds of the student body" to the success of a bilingual program of education. Id. Had an individual school district adopted the PPST requirement as a prerequisite to hiring its faculty, undoubtedly this court would have had jurisdiction to hear the complaint. The fact that the requirement is imposed on all school districts by the Texas Education Agency makes a difference in the impact of the PPST requirement, but not on the jurisdiction of this court.
However, the plaintiff-intervenors' and applicants' demand that this court extend its jurisdiction to the agreement between the United States Department of Education and the State of Texas is rejected. All of plaintiff-intervenors' and applicants' other claims arise under the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.[14]United States v. Texas was originally brought under the Fourteenth Amendment and Title VI of the Civil Rights Act and concerns the elimination of the dual school system in Texas. The claim brought under the Texas Equal Education Plan for Higher Education wanders farther afield, both in terms of the facts and the law, than this court's jurisdiction can follow. The Equal Education Plan for Higher Education has solely to do with discrimination at the college and university level, and is essentially a contract between the United States and the State of Texas. The allegations of the plaintiff-intervenors regarding the imposition of the PPST requirement engage the concern of this court with respect to its order in United States v. Texas, to the extent that defendant's actions tend to frustrate the goal of a unitary school system, by excluding members of racial minorities from teaching in the primary and secondary schools of Texas. The progress of the State of Texas in ensuring equal educational opportunity in colleges and universities is, jurisdictionally speaking, not a concern of this court. Moreover, the legal process of interpreting a contract is not similar to weighing the actions and intent of the state against its obligations under the Fourteenth Amendment and Title VI of the Civil Rights Act.

INTERVENTION

A. Motion for Preliminary Injunction

The four factors that a court must consider in determining whether to grant preliminary injunction are:
(1) irreparable harm to the plaintiff from failure to issue injunction;
(2) the relative lack of harm to the defendant from issuance of the injunction;
(3) the public interest; and

*313 (4) the probability that plaintiff will ultimately succeed on the merits.
Camenisch v. University of Texas, 616 F.2d 127, 130 (5th Cir.1980), vacated as moot, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). The granting of a preliminary injunction rests in the sound discretion of the court, and will only be overturned for abuse of that discretion. Meyers v. Moody, 723 F.2d 388, 389 (5th Cir. 1984).

1. Irreparable harm

Plaintiff-intervenors and applicants contend, principally, that irreparable harm will ensue to minority students, if the preliminary injunction is not granted. It is urged that, if these students are prevented from taking courses in the education departments of their schools while the PPST issue is being litigated, their certification as teachers will be postponed by at least six months to a year. Thus, even if plaintiff-intervenors and applicants were ultimately to prevail, the school children of Texas would be deprived of these teachers at a time when the state is experiencing a significant teacher shortage.[15]
An injury is "irreparable" if it cannot be undone through monetary remedies. Deerfield Medical Center v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981); Spiegel v. City of Houston, 636 F.2d 997, 1001 (5th Cir.1981). The Fifth Circuit has found that a university's action preventing a student from completing the master's degree requirements that were a prerequisite to his employment constituted "clear" irreparable harm. Camenisch v. University of Texas, 616 F.2d 127, 130 (5th Cir.1980), vacated on other grounds, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981);[16]accord Tatro v. State of Texas, 625 F.2d 557, 564 (5th Cir.1980) (suggesting that exclusion from school or university programs constitutes irreparable harm).[17] It is concluded, therefore, that plaintiff-intervenors have succeeded in establishing irreparable harm.

2. The relative lack of harm to defendants from issuance of the injunction

At the hearing, Dr. William Kirby, Director of Education for the Texas Education Agency, outlined three harms if students were allowed to pursue their studies, even if they had not passed the PPST. These harms were: students would be allowed to take courses in which they did not have basic skills; public perception would be negative; and permitting students to pursue their education would be unfair to the students themselves, if the PPST requirement were allowed to stand.
None of these "harms" is persuasive. The students presented by plaintiff-intervenors had been receiving "A" and "B" grades in their courses; and many had missed the preclusionary score on the PPST by one or two points. Representatives of the Educational Testing Service, *314 which developed the test, testified that there was an uncertainty of approximately eight points on the scoring. Dr. Mary Griffith, Director of the Community College Program of the College and University Coordinating Board of Texas, testified that many bright students lack basic skills, but can nevertheless absorb the content of the course when it is presented orally by a teacher.
As to the negative public perception, the comments of the Court of Appeals for the Fifth Circuit in the leading case on preliminary injunctions, Canal Authority v. Callaway, 489 F.2d 567, 575 (5th Cir.1974), are dispositive:
We do not regard the question of the psychological impact of an order on either the parties or the public as a relevant consideration under the facts of this case. In no way does it affect the court's ability to render a meaningful decision on the merits: it neither enhances nor detracts from plaintiff's chances of success on the merits; it tends neither to show nor negate irreparable injury to either party; and it is not probative on the issue of the public interest.
Finally, defendant TEA raises the possibility of harm to the education students who will be attending classes should the lawsuit ultimately fail. The defendant suggests that these students will have wasted their time taking the courses, only to find out that they cannot be certified as teachers.[18] It would be practicable, however, for this court to order that all students enrolling in classes that they would otherwise be prevented from taking because of the PPST requirement be notified of the full import of the decision. Students who received such notification could weigh for themselves the benefits and drawbacks of enrolling in teacher education courses during the pendency of this litigation. Thus, each student could make his or her own choice regarding the risk of pursuing courses in the education department.

3. The public interest

The public interest in this action is threefold: (1) the interest in having sufficient numbers of teachers, especially in areas which have particularly suffered, in the past, from the burden of the dual school system; (2) the interest in having competent teachers, able to convey knowledge to their pupils and provide positive role models; and (3) the interest in an integrated, unitary school system free of racial discrimination at any level. The public interest in competent teachersassuming that the PPST does provide some valid measurement of teacher competenceis not implicated by granting the preliminary injunction. The preliminary injunction herein sought would merely allow students to take courses and to perform student teaching; it would not permit teachers to be certified and teach in the schools of Texas without passing the PPST.[19] Therefore, the interest of allaying the teacher shortage in Texas, to the extent possible, is served by granting the preliminary injunction. The public interest is not deserved by allowing students to take courses in college and to practice teaching students.

4. Likelihood of success on the merits

The plaintiff-intervenors and applicants have attacked the imposition of the PPST on numerous grounds other than as a violation of this court's order in United States v. Texas. Applicants Dugas, Elizalde, et al., claim that their rights under the Equal Protection clause, the Due Process clause, Title VI of the Civil Rights Act, and as third-party beneficiaries of the agreement between the State of Texas and the United States Department of Education, known as *315 the Texas Equal Education Plan for Higher Education, have been violated.
While it is improper to equate "likelihood of success" with "success," University of Texas v. Camenisch, 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981), it is concluded, on the basis of the evidence adduced during the seven-day hearing, that plaintiff-intervenors have demonstrated a likelihood of success on their claims under the Equal Protection clause, the Due Process clause, Title VI of the Civil Rights Act, and the Equal Educational Opportunity Act, 20 U.S.C. § 1703.
In order to prevail on their claim that the imposition of the PPST and the determination of preclusionary scores violated the Equal Protection clause, plaintiff-intervenors must show that defendant acted with discriminatory intent or purpose. Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Adoption of standardized tests is obviously impermissible if undertaken with discriminatory purpose. Moore v. Tangipahoa Parish School Board, 594 F.2d 489, 498-99 (5th Cir.1979); Baker v. Columbus Municipal Separate School District, 462 F.2d 1112 (5th Cir. 1972). Discriminatory purpose is elusive and difficult to prove, especially when what must be proven is discriminatory intent on the part of a state agency or board. The Supreme Court has recognized this:
Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the `dominant' or `primary' one.... Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it `bears more heavily on one race than another,' may provide an important starting point.
Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 265, 266, 97 S.Ct. 555, 563, 564, 50 L.Ed.2d 450 (1977) (citation omitted).
The inquiry may not end with discriminatory impact, if the state can advance reasons other than race for taking its action. In this instance, the state argued that it was concerned with ensuring teacher competency. The Supreme Court in Arlington Heights suggested that a court's inquiry encompass disparate impact, the historical background of the decision, and legislative or administrative history of the specific decision, if possible.
The historical background of this decision is one of repeated and recent instances of intentional segregation, particularly in areas of South Texas where there is a substantial Mexican-American population. See, e.g., United States v. Texas Education Agency, 679 F.2d 1104 (5th Cir.1982) (Port Arthur Independent School District); United States v. Texas Education Agency, 647 F.2d 504 (5th Cir.1981) (South Park Independent School District).
The administrative history of the adoption of the PPST requirement is one replete with the warnings and protestations of college presidents and representatives of minority organizations. The four minority representatives on the Texas Board of Education also voiced their concern and were rewarded with the formation of a committee with no power which effected no change.
The evidence adduced at the hearing showed that the TEA and the Texas State Board of Education were aware of the tremendous disparate impact of the test from their consideration of Dr. James Popham's study, and that they took no action either to discover whether the test itself was the source of the impact or whether alternative tests existed. Neither did they organize any sort of remediation program specifically directed at preparing minority students for the PPST.
The defendant argued that the remedial programs in place at community colleges before the adoption of the PPST were sufficient for this purpose. However, the evidence shows that the remedial programs *316 were adopted to serve a different purpose and a different target group. Plaintiff-intervenors introduced testimony by Terry Walsh, a counselor at a junior college, that the remedial courses were aimed at students who could not pass college English and mathematics courses; many of the students who fail the PPST received A's and B's in their college English and mathematics courses. Plaintiff-Intervenors' Exhibits 44, 45 and 46. In addition, defendant itself called as witnesses two professors at institutions with heavy minority populations, Pan American University at Edinburg and University of Texas at El Paso, and plaintiff-intervenors and applicants called two professors from Pan American University at Brownsville (whose student body is overwhelmingly Hispanic) and Texas Southern University (where Black students heavily preponderate). At each institution, a remedial program devised specifically to help students pass the PPST had been hastily put together, showing that those administering the teacher education programs did not share the defendants' conviction that the general remedial courses offered by community colleges were sufficient to meet the need. None of the state's education budget was used to assist these colleges and universities: Texas Southern University professors volunteered their time; Pan American University at Edinburg requested funds and was turned down.
Particularly disturbing was testimony that, in the face of severe teacher shortages, one of two principal solutions of defendant was to institute a program of "alternative certification."[20] Under this program, persons graduating from college and passing the PPST would be allowed to teach on a concept akin to apprenticeship without having to take any courses in teacher education. The choice to sacrifice the requirement of two years of training specifically directed at being a teacher, including student teaching, rather than change the PPST preclusionary scores or petition the Legislature to allow waiver of the PPST requirement,[21] was one of the strongest indications of racial intent presented at the hearing. In effect, by the program of alternative certification, the defendant put itself on the record as considering the PPST more important than teacher education courses and student teaching. To use an analogy the defendant referred to repeatedly at the hearing, this is akin to allowing a person to get a driver's license simply by passing the eye examination, without taking either the written test or an actual driving test.[22]
The Court of Appeals for the Fifth Circuit has noted with regard to intent that:
an invidiously discriminatory purpose may frequently be inferred where racial minorities suffer a disproportionately adverse effect. Moreover, it is established that this rule applies not only in instances where the official conduct initially bringing about unequal conditions is called into question, but also to the failure of responsible officials to thereafter take action to terminate such inequality in respect to matters within their charge. ... Thus ... the DISD's long-continued retention of such disparity when it so unequally impacted black students could, under the facts of this case, be inferred to have resulted in material part from *317 racial considerations on the part of district officials.
Price v. Denison Independent School District, 694 F.2d 334, 371 (5th Cir.1982) (citations omitted). The indifference displayed by the defendant to the massive adverse impact of the PPST requirement, and the lack of any coordinated attempt to institute an organized program of remediation targeted at helping students to pass the PPST, seem to have sprung from an attitude that minority students were themselves to blame for their poor performance. This was reflected most strikingly in the testimony of Dr. Victoria Bergin, Deputy Commissioner of Education for School Support, and herself a Hispanic American. She testified that students in the Texas school system have had the opportunity to learn basic skills, and apparently sought to infer that three alternate reasons explained poor performance on PPST, to the exclusion of other explanations: lack of intellectual ability on the part of the students; failure to listen in class and do homework; or the teachers' lack of the basic skills necessary to teach students. The fact that Dr. Bergin herself is Hispanic does not, as a matter of law, exempt her from the possibility of discriminatory intent. "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." Castaneda v. Partida, 430 U.S. 482, 499, 97 S.Ct. 1272, 1282, 51 L.Ed.2d 498 (1977).
Dr. William Kirby offered his theory that income, not race, was responsible for the massive difference in pass rates as between Whites and minority students, a view that was shared by Dr. Jorge DesCamps, a professor at the University of Texas at El Paso. The income of the students and their families does not explain the complete inertia of the state with regard to remediation procedures. The state's passivity seems particularly callous in the face of the almost heroic efforts made by colleges and universities with heavy minority concentrations hastily to devise makeshift remediation programs of their own. In so doing, they relied heavily on volunteer time by professors; since they had not been given sample tests or other information about the PPST, they contrived tests of their own that they desperately hoped would approximate the PPST.
The Court of Appeals for the Fifth Circuit has held that the most reliable way to determine discriminatory intent in a school desegregation case is to look at the reasonably foreseeable results of the actions being challenged.
Neither [Washington v. Davis nor Arlington Heights] abrogated the principle that an actor is held to intend the reasonably foreseeable results of his actions. ... Realistically, this judicial mechanism is the most reliable one for the objective determination of intent. This is doubly true when intent to segregate is at issue.
[P]erhaps, however, the Board thinks that there must be statements by its members that, "We do not want to mix whites and Mexican-Americans." ... The [Austin Independent School District] seems to think that because of its stated benign motives, it could not have intentionally discriminated against Mexican-Americans. This notion shows a misunderstanding of school desegregation. The most effective way to determine whether a body intended to discriminate is to look at what it has done.
United States v. Texas Education Agency, 579 F.2d 910, 913-14 (5th Cir.1978) (finding intentional discrimination in Austin Independent School District).
Finally, it is extremely significant that, at the time the decisions were made to adopt the PPST and its preclusionary scores, the Texas Board of Education (which controls TEA policy) was composed of twenty-seven members, with only one Black and three Hispanic members. This factor adds weight to plaintiff-intervenors' and applicants' claims of intentional discrimination, for these minority members could get no more response to their concerns about minority impact than the appointment *318 of an apparently powerless committee which met once and dissolved. When Volly Caldwell Bastine (the only Black on the Board of Education at the time the PPST decisions were made) was called by defendant to testify, he conceded that if the then-chairman of the board, Joe Kelly Butler, had wanted the committee investigating the adverse impact of the PPST on minorities to have power, the committee undoubtedly would have been extended that power. When asked on direct examination whether any statements were made at Board meetings that would indicate discriminatory intent, he answered that he had never heard any, but added, "I was the only black on the State Board of Education at the time, and I couldn't be everywhere." The entire record presented by plaintiff-intervenors in this case encompasses the past four years of actionand inactionby the defendant. Thus, it is very different from the situation in United States v. State of South Carolina, 445 F.Supp. 1094 (D.S.C.1977), aff'd, 434 U.S. 1026, 54 L.Ed.2d 775 (1978), where the court found insufficient evidence of discriminatory intent, because "[p]laintiffs' elaborate web of historical circumstances, from which the court is being asked to infer discriminatory purpose, is noticeably silent about recent events." Id. at 1104.
Because of evidence strongly suggesting that defendants acted with discriminatory intent in adopting the PPST, it is concluded that plaintiff-intervenors have a likelihood of success on their claims under the Equal Protection Clause of the Fourteenth Amendment.

B. Due Process

In order to claim successfully that a state action has deprived them of due process of law, plaintiff-intervenors and applicants must first establish a liberty or property interest that the state has denied them. Board of Regents v. Roth, 408 U.S. 564, 569, 570, 571, 92 S.Ct. 2701, 2705, 2706, 33 L.Ed.2d 548 (1972). Although at the hearing they appeared to bottom their due process claim on the denial of a property interest, as in Debra P. v. Turlington, 644 F.2d 397, 404 (5th Cir.1981) (students have a property interest in high school diploma), it is unlikely that plaintiff-intervenors can establish the presence of a property interest here. The court in Debra P. emphasized that "in establishing a system of free public education and in making school attendance mandatory, the state has created an expectation in the students." Id. at 404 (emphasis added). The court continued: "[T]he expectation is that if a student attends school during those required years, and indeed more, and if he takes and passes the required courses, he will receive a diploma." Id. The expectations are not so sharply defined in the case before the court. In the first place, the expectation plaintiff-intervenors and applicants seek to rely on cannot be the expectation of admission into a teacher education program, because, as was established at the hearing, that decision is in the hands of the colleges and universities and not the state.[23] The Fourteenth Amendment applies only to state actions. Therefore, the expectation must be that a student will receive teacher certification, which is conferred by the state. However, certification is based, not only upon taking and passing the required courses, but upon satisfactory completion of student teaching. Dr. Jorge DesCamps, a professor at the University of Texas at El Paso, unequivocally stated that he would not permit a student who did poorly at his or her student teaching assignment to be certified as a teacher, even if his or her grades were excellent. Hence, the symmetry of the quasi-contractual relationship between the state and the high school student, referred to in Debra P. v. Turlington, is disturbed in this case by the presence of the colleges and universities, which have sufficient discretion that the state *319 cannot, in effect, "promise" a student that he or she will be admitted to a teacher education program or be certified as a teacher.
The inquiry does not end with property interests, however. The plaintiff-intervenors and applicants also argue that students have a liberty interest in being able to pursue the occupation of their choice without arbitrary or discriminatory interference from the state. Failure to pass the PPST unequivocally deprives a student of the opportunity to teach in Texas. There are no provisos for waiver, and even the alternative certification program includes the requirement of passing the PPST. The students do "plainly [have] a protectable interest in not being arbitrarily or discriminatorily denied the opportunity to practice [their] profession ... [and] must be granted due process protections necessary to uphold that interest." Phillips v. Vandygriff, 724 F.2d 490, 493 (5th Cir.1984) (citing Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957)), cert. denied, ___ U.S. ___, 105 S.Ct. 94, 83 L.Ed.2d 40 (1985).
Although the scope of these due process rights is not clear, it seems obvious that, at a minimum, the students were entitled to reasonable notice of the state's requirement. Id. Defendants' witnesses DesCamps, Morris, and others testified that minority students did substantially better on the PPST when they were given time to pursue remediation specifically aimed at the PPST. Students such as applicant Leslie Dugas testified that they were particularly disconcerted by the format of the test and the fact that it was timed. The evidence indicated that White students, more accustomed to taking standardized tests, are already familiar with their format. Thus, the requirement that both students and the teacher education departments of colleges and universities have notice of the impending PPST requirement gains heightened importance.
If one fact was obvious at the hearing, it was that the students and teacher education programs were given very little notice of the PPST requirement and the proposed preclusionary scores. Moreover, they were given no materials to help prepare for the PPST beyond a pamphlet. The effective date of the PPST requirement was May 1, 1984. The Board of Education determined the preclusionary scores on the test in February 1984. The first official administration of the PPST was in March 1984. The validation study conducted by Dr. James Popham of IOX Associates was completed in September 1983. Part of the study included a pilot test of some 1,000 students conducted in April 1983. The results of the pilot test, showing the extreme differences in performance by Whites and minorities, was submitted to the TEA on June 27, 1983. Plaintiff-intervenors' Exhibit 26, Report No. 4. Therefore, while defendant knew of the massive adverse impact of its proposed requirement on minority students around 1983, it made no effort to provide colleges and universities with any preparatory materials or funds for remediation.
The applicants called as witnesses by plaintiff-intervenors testified, for the most part, that they had learned of the existence of the test requirement in 1984. Irene Rael became aware of the requirement in the fall of 1984; Oralia Martinez in the spring of 1984; Leslie Dugas in the spring of 1984; Aurora Gutierrez knew of the requirement in late 1983, but only because she was selected to take part in a sample test. The determination and dedication of these students to pass the PPST makes it completely evident that their failure to learn of the PPST was not due to laxity and indifference on their part. It is clear from the correspondence emanating from the Texas Education Agency (Plaintiff-intervenors' Exhibits 4, 5 and 6) that the requirement was adopted in a rather disorganized fashion, with insufficient publicity or clarity.
From the evidence presented at the hearing on the application for preliminary injunction, it is concluded that plaintiff-intervenors are likely to prove that the TEA deprived them of their right to teach in *320 Texas, without sufficient notice concerning the nature and imminence of the PPST.
Plaintiff-intervenors and applicants also attacked the validation study of the PPST, which was performed by Dr. James Popham and IOX Associates for the State of Texas. The PPST validation study purported to conclude, inter alia, that students in Texas had been taught the materials covered in the PPST. This showing is necessary under the law of Debra P. v. Turlington, 644 F.2d 397, 404 (5th Cir.1981). Holding that the concept of due process forbids a state from taking actions that are "fundamentally unfair," the court found that "the state administered a test that was, at least on the record before us, fundamentally unfair in that it may have covered matters not taught in the schools of the state." (Emphasis in original.)
Popham and IOX Associates endeavored to discover whether the PPST tested subjects taught in Texas by conducting surveys of educators, students, and textbooks. The latter analysis looked at seventh through twelfth grades textbooks used in Texas public schools in 1981-1982, and made no effort to determine how long those particular textbooks had been in use. The possibility exists, therefore, that virtually none of the students taking the PPST had used those textbooks.[24] In addition, because the Educational Testing Service had not described the skills that the PPST was supposed to test with sufficient specificity, Dr. Popham and IOX prepared their own specifications, which were based on the single PPST test form available to them. In itself, this action casts some doubt on the procedure; but, even worse, when the independent textbook analyzers hired by IOX identified fewer textbook pages as relevant than did the verification-analysts, the textbook analyzers were told to go back and redo their analysis. Interestingly, the individuals referred to as "verification-analysts" in Dr. Popham's report were Dr. Popham himself and his associates. In light of these circumstances, the textbook analysis is entitled to little weight.
Plaintiff-intervenors and applicants attacked the educator surveys on numerous grounds. They objected to the fact that 300 educators were surveyed in Texas, whereas in Florida 30,000 were mailed questionnaires. They objected to the phrasing of the surveys, pointing out defects in the possible responses to the question of whether the individual districts prepared students for the material on the PPST. The designated answers were that preparation was provided for (1) "Almost all," (2) "Most," (3) "a small amount" or (4) "none" of the content of the PPST. Any middle ground was excluded from the answers, and no percentile definition of what each of these terms might mean was provided. Plaintiff-intervenors and applicants attacked the student surveys for using the same language, and also claimed that the student surveys should have broken down responses to the questions about adequacy of preparation by race. Although plaintiff-intervenors and applicants apparently approved of Dr. Popham's survey of a much larger number of personnel in the Florida studyan action that Popham characterized as made more for political reasons than out of statistical necessitythey did not grant that Popham's Florida study was itself valid. Plaintiff-intervenors produced an expert, Dr. Shapiro, who pointed out the defects of the IOX study, and to some extent suggested improvements that could have been made. The plaintiff-intervenors did not produce an example of an acceptable validation study, since they did not have access to the PPST itself until halfway into the hearing. By the time that an actual trial on the merits is held, plaintiff-intervenors will presumably have time to *321 conduct a validation study of their own, and this court will be in a better position to evaluate the feasibility of Dr. Shapiro's proposals and the actual harm, if any, caused by the defects in Dr. Popham's procedure. At this time, insufficient evidence has been presented on which to decide the likelihood of plaintiff-intervenors' success on the merits of their charge that the PPST was inadequately validated, in violation of students' right to fundamental fairness, as enunciated in Debra P. v. Turlington.

C. Title VI Claim

The plaintiff-intervenors also claim that defendants' alleged discrimination in the adoption of the PPST states a cause of action under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, which provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The plaintiff-intervenors and defendants disagreed at trial over the interpretation of the most recent Supreme Court decision regarding Title VI, Guardians Association v. Civil Service Commission, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), which presents the question whether intentional discrimination must be proven in order to make out a violation of Title VI. The confusion over Guardians Association is not surprising.[25] In Alexander v. Choate, ___ U.S. ___, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), a unanimous Court clarified Guardians to some extent:
[M]embers of the Court offered widely varying interpretations of Title VI. Nonetheless, a two-pronged holding on the nature of discrimination proscribed by Title VI emerged in that case. First, the Court held that Title VI itself directly reached only instances of intentional discrimination. Second, the Court held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purpose of Title VI. ... Guardians, therefore, does not support petitioner's blanket proposition that federal law proscribes only intentional discrimination....
Alexander v. Choate, 105 S.Ct. at 717.
Plaintiff-intervenors have cited to a regulation of the Department of Education that they claim has been violated by the defendants in this case. The regulation provides as follows:
a recipient [of federal funds] in determining the ... class of individuals to be afforded an opportunity to participate in any such program [i.e., a federally assisted educational program], may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color or national origin.
34 C.F.R. § 100.3(b)(2) (emphasis added).
It is undisputed that Texas receives federal financial assistance for its education programs, including specifically its teacher education programs and programs to aid *322 the educationally disadvantaged. Plaintiff-intervenors' Exhibit 35.
Defendants dispute their liability under Title VI and the regulations appurtenant to Title VI, claiming:
1. No federal funds have been channelled to PPST activity.
2. No private right exists under Title VI or its regulations, and any enforcement action may only be brought pursuant to 42 U.S.C. § 1983. Further, defendant TEA is immune under § 1983.
3. Plaintiff-intervenors are required to pursue administrative remedies for violations of the Department of Education regulations before proceeding to court.
As to the argument that Title VI does not apply to the defendants' use of the PPST because no federal funds are used to administer the PPST, defendants' citation to Grove City College v. Bell is particularly inapposite. Grove City College v. Bell, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), which construed the requirements of Title IX, declared that federal financial assistance to one "education program or activity" of a university does not mean that Title IX requirements extend to all programs and activities. Id. at ___, 104 S.Ct. at 1221-22. The majority makes no reference whatever to Title VI in its decision. But the dissent uses judicial construction of Title VI to argue that the scope of Title IX is broader than the majority has concluded; the cases cited to demonstrate the broad scope of Title VI are all from the Court of Appeals for the Fifth Circuit. Id. at ___, 104 S.Ct. at 1228-31 ("The principal judicial interpretations of Title VI prior to 1972 [the year that Title IX was enacted] were announced by the United States Court of Appeals for the Fifth Circuit."). It is thus concluded that the scope of Title VI is broader than the defendants would argue. The fact that no federal money was specifically channelled into the PPST is not dispositive of Title VI coverage, therefore, since Title VI is broader in scope than Title IX. Even if Title IX did apply, the PPST is clearly part of the program of teacher education in Texas, and the teacher program receives federal funds. Defendants, by their own contention that the PPST is used to improve the quality of students in teacher education programs, link the PPST inextricably to the teacher education program itself. Grove City v. Bell does not support a contention that federal money would have to be spent on every specific item in a program in order for that item to be covered by Title IX. Accordingly, the defendants' argument that, because no federal money is spent on the PPST, there is no Title VI coverage to redress discrimination relating to the PPST, has no merit.
Moreover, contrary to defendants' second argument, the Guardians decision implies that a private right of action does exist to enforce Title VI when only injunctive, rather than compensatory, relief is sought. 463 U.S. at 591-97, 103 S.Ct. at 3226-29. See The Supreme Court, 1982 Term, 97 Harv.L.Rev. 70, 250-51 (1982).
Finally, the administrative remedies defendants cite to, which are provided for by the regulations, do not appear to be mandatory.
Since the court has already concluded that plaintiff-intervenors have a substantial likelihood of success on the merits with respect to their constitutional causes of action requiring intent, it is concluded that this likelihood extends to their cause of action under 42 U.S.C. § 2000d.

D. Equal Educational Opportunity Act, 20 U.S.C. § 1703(d).
The Equal Educational Opportunity Act provides that:
No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by
....
(b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with subpart 4 of this *323 title [20 U.S.C. § 1721] to remove the vestiges of a dual school system.
The court in Debra P. v. Turlington, 644 F.2d 397 (5th Cir.1981), found that, because the functional literacy test in Florida was used to deny a diploma to students who had suffered under the dual school system, and thus to perpetuate past discrimination, the use of the test to prevent students from receiving a diploma violated the Equal Educational Opportunity Act. Id. at 407-08. The Debra P. case was decided by the district court in 1979, and the Circuit Court recently decided that sufficient time had passed and sufficient remediation had been instituted that the diploma sanction could be reinstituted. Debra P. by Irene P. v. Turlington, 730 F.2d 1405, 1417 (11th Cir.1984). In the case before this court, however, evidence at the hearing showed that many of the students wishing to enter the teacher education program were older students, who had attended school under the dual system, left to rear a family, and had recently returned to try to become teachers. In high school, it is much more reasonable to assume that "the students in the high school class of 1983 would be the first to have attended physically integrated schools for all twelve years of their educational careers," id. at 1407, because most students proceed through high school in a yearly sequence; but the same cannot be said of students in the teacher education programs of Texas. It was clear from the testimony of Ms. Gutierrez, Ms. Rael, and Mr. Dugas that they had attended schools "inferior in physical facilities, course offerings, instructional materials, and equipment." Debra P. v. Turlington, 644 F.2d at 407. This court takes judicial notice of its own findings regarding the nature of the Texas school system over the years as well. In addition, programs comparable to the remediation programs considered so essential in Debra P. v. Turlington, 730 F.2d at 1410, have not been instituted in Texas. Although it will be necessary that plaintiff-intervenors and applicants produce more evidence regarding the duration of the dual school system in Texas at the trial on the merits, it is concluded that they have a substantial likelihood of success on the merits of this claim.
By reason of the foregoing considerations, the defendants' motion to dismiss for lack of jurisdiction will be denied; and plaintiff-intervenors' motion for a preliminary injunction will be granted. Orders will be entered accordingly.
NOTES
[1] The League of United Latin American Citizens ("LULAC") and GI Forum, Mexican-American organizations, and the National Association for the Advancement of Colored People, all plaintiff-intervenors, were permitted to intervene in this civil action in 1972.
[2] The fourteen applicants are Black and Hispanic education students prevented from completing their studies by the implementation of the Pre-Professional Skills Test. They seek to represent themselves and others similarly situated. An order shall issue granting the application for intervention.
[3] Texas Education Code Ann. § 13.032(e) (Vernon Supp.1986).
[4] As Dr. Nolan Wood, Director of the Division of Professional Assessment for the Texas Education Agency, testified, the test is geared to the level of a high school senior or freshman in college. This target level is important to remember, in view of the fact that at the hearing on the preliminary injunction, defendants' witnesses frequently referred to the test as though it measured functional literacy, e.g., "I don't want my kids taught by someone who can't read or write." Dr. Wood testified that a literacy test is measured by the ability to read or write at the seventh or eighth grade level.
[5] TEA will hereafter be referred to as "defendant" on occasion.
[6] Although the United States initially brought this action in 1970, its appearance at the hearing was described by its own counsel as being the role of amicus curiae.
[7] Defendant claims that the Western District of Texas is the more appropriate forum for this suit because its offices and records are in Austin. At the beginning of the hearing, defendant moved for a change of venue, which was denied.
[8] This order is reproduced in full as an appendix to the Fifth Circuit's opinion in United States v. Texas, 447 F.2d 441, 442-49 (5th Cir.1971), cert. denied, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10 (1972). The April 20, 1971, order of this court shall be cited by referring to the appellate opinion in which it is incorporated.
[9] The significance of full integration in these latter areas was reemphasized by the Supreme Court in Swann v. Board of Education, 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971), published the same day as this court's desegregation order in United States v. Texas. The Court of Appeals for the Fifth Circuit had previously declared, "The Constitution ... requires public school systems to integrate students, faculties, facilities, and activities." United States v. Jefferson County Board of Education, 372 F.2d 836, 845-46 (5th Cir.1966), cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).
[10] Jurisdiction has been denied over several actions brought under the aegis of United States v. Texas. In the most recent of these, parents of black children in the Texarkana School District challenged the decision of a neighboring school district, Pleasant Grove, to build a new high school. The Texarkana parents charged that the plans to build a new high school would have the effect of creating an all-white high school, and allowing Pleasant Grove to discontinue its practice of sending its high school students to the integrated high school in Texarkana. It was found that "[t]he proposed complaint in intervention raises novel issues that have not previously been confronted in this case, and issues which do not appear to be affected by the existing orders of this court." Consequently, the motion to intervene was denied. United States v. Texas, No. 5281 (E.D.Tex. July 29, 1983) (order denying intervention).
[11] In fact, the issue of testing was dealt with in 1971. Defendants' plan submitted to the court addressed the issue of faculty segregation by promising to apply the National Teacher's Examination in a race-neutral fashion. This proposal was rejected as insufficient to meet defendants' obligations, because defendants did not propose to undertake any affirmative action.
[12] The early cases of the greatest significance are deliberately cited to demonstrate what legal precedent informed the thinking of this court when it couched the terms of the April 20, 1971, decree. All cases referred to above were cited in its opinions of December 4, 1970, and April 20, 1971.
[13] The validity of this specific aspect of the order has since been called into question by the holdings in Castaneda v. Pickard 648 F.2d 989 (5th Cir.1981), and Stafford v. Fort Bend School District, 651 F.2d 1133 (5th Cir.1981).
[14] Plaintiff-intervenors also state a claim under the Equal Educational Opportunities Act, 20 U.S.C. § 1703. However, the elements to be proven and the scope of the Equal Educational Opportunities Act are identical to the elements and scope of Title VI, Castaneda v. Pickard, 648 F.2d 989, 1000-01 (5th Cir.1981), and therefore the questions of law and fact to be determined will be very similar, if not identical.
[15] Plaintiff-intervenors and applicants also point to the possibility that many teacher candidates will simply give up and drop out; but the testimony at the hearing was entirely to the contrary. All of plaintiff-intervenors' student witnesses declared their intention to continue to attempt to gain admission into the teacher education programs, and two of the defendant's witnesses who are involved in teacher education at Pan American University at Brownsville and at the University of Texas at El Paso confirmed the resolution of the majority of their students to "hang in there."
[16] Camenisch involved the refusal by the University of Texas to provide a deaf graduate student with a sign language interpreter. The Supreme Court remanded for a full trial on the issue of whether the University should pay for the interpreter, noting that the fact that Camenisch had by that time completed his studies did not make the issue moot.
[17] The Seventh Circuit has suggested that delay in obtaining admission to a graduate school for purposes of pursuing professional studies, as opposed to interruption or termination of attendance already in progress, is not ordinarily considered irreparable injury. Martin v. Helsted, 699 F.2d 387, 391-92 (7th Cir.1983). It is not clear whether the facts of this case would fit the Seventh Circuit's definition of interruption of attendance already in progress, since students are attending college and may take six hours in the education department before being excluded by their failure to pass the PPST. In any case, this court is bound by the law of the Fifth Circuit.
[18] The consideration that the classes may be intrinsically beneficial, and that some students may pass the PPST while the preliminary injunction hereafter granted is in effect, will be laid aside.
[19] If the use of the PPST is permanently enjoined, as plaintiff-intervenors and applicants demand, the Texas schools will not be required to wait six months to a year for students excluded by the PPST requirement to catch up with their studies and complete their student teaching requirements.
[20] The other solution was to raise teachers' salaries.
[21] A waiver would be permitted, for example, in cases where a student's performance in student teaching was excellent, the student's grades were high, the student was bilingual, or some other factor weighed heavily in the student's favor.
[22] At the hearing, defendant's witnesses compared the requirements of teacher's education courses, student teaching, and the PPST to the requirements of a written examination, a driving test, and an eye examination for a driver's license. To carry the analogy further, it is similar to allowing an applicant to receive a driver's license simply by passing the eye examination, when it is not at all certain that the eye examination actually measures the ability to see, when the eye examination has only been in effect for a year, and when it is well known that minorities fail the eye examination at much higher rates than Whites, although they do well on the driving test and have been driving on the roads of Texas for years.
[23] While the state can prevent entrance into a college or university teacher education program, it cannot ensure a student's entrance. A college or university has far more discretion to set standards for admission into its teacher educator program than a high school does to deny a high school student a diploma.
[24] Two of the students called by plaintiff-intervenors as witnesses were women who had returned to school after leaving to marry and have children. Dr. Jorge DesCamps testified that an increasing number of students in the Education Department at the University of Texas at El Paso were women returning to school after raising families, and also retirees. Obviously, the analysis of 1981-1982 text books would be completely irrelevant as to these individuals.
[25] As the Harvard Law Review editors recapitulated the holding of Guardians Association, "Justice White, who cast the decisive vote in the case, agreed with the four dissentersJustices Brennan, Marshall, Blackmun, and Stevens that the regulatory scheme promulgated under Title VI prohibits actions having a disparate impact on minorities. These five Justices, joined by Justice Rehnquist, also recognized a private right of action to enforce Title VI and its regulations, at least against governmental recipients of federal funds. Nonetheless, Justice White joined a different majority whose members voted to affirm the judgment below but could not agree on a common rationale. Four members of the Court, in opinions by Justices Powell and O'Connor, took the position that discriminatory intent is required under Title VI. Justice White voted to affirm on the ground that compensatory relief should not be awarded under Title VI absent proof of discriminatory intent." The Supreme Court, 1982 Term, 97 Harv.L.Rev. 70, 245-46 (1983).